**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FEDERAL HOUSING FINANCE AGENCY, IN ITS CAPACITY AS CONSERVATOR OF THE FEDERAL HOME LOAN MORTGAGE CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> WELLS FARGO SECURITIES, LLC, f/k/a WACHOVIA CAPITAL MARKETS, LLC, <br><br> Defendant. | Case No.  1:19-cv-5207 <br><br> **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

## <u>TABLE OF CONTENTS</u>

NATURE OF THE ACTION ................................................................................................ 1

PARTIES AND RELEVANT NON-PARTIES ................................................................... 5

    FHFA and Freddie Mac ................................................................................................. 5

    Defendant Wells ............................................................................................................ 6

    The Non-Party NovaStar Entities ................................................................................. 7

    The Non-Party Underwriters ......................................................................................... 8

JURISDICTION AND VENUE .......................................................................................... 8

TIMELINESS OF THE INSTANT ACTION ..................................................................... 9

    The Class Action ......................................................................................................... 10

    The Tolling Agreement ............................................................................................... 12

FACTUAL ALLEGATIONS ............................................................................................. 13

A.  The NovaStar Trusts ................................................................................................. 13

     1.  Residential Mortgage-Backed Securitizations Generally .............................. 13

     2.  The NovaStar Trusts, the NHEL Certificates, and the NovaStar Bonds ........ 17

        a.  The Registration Statements for the NHEL Certificates ...................... 17

           1.  The NovaStar 2006-3 Trust and NHEL 2006-3 Certificates ......... 18

           2.  The NovaStar 2006-6 Trust and NHEL 2006-6 Certificates ......... 20

        b.  The Sale of the NHEL Certificates ...................................................... 23

B.  Representations in the Registration Statements ....................................................... 24

     1.    Representations Regarding Compliance with NMI's Guidelines ............. 24

     2.    Representations Regarding LTV Ratios ................................................... 30

     3.    Representations Regarding Credit Ratings ............................................... 32

C.  The Falsity of the Registration Statements' Representations.................................... 33

     1.    NMI's Underwriting Guidelines Were Systematically Disregarded ........ 34

        a.  A Forensic Review of Loan Files Has Revealed a Pervasive
           Failure to Adhere to NMI's Guidelines .............................................. 34

           1.  Stated Incomes Were Not Reasonable ........................................ 36

           2.  Debts Were Incorrectly Calculated and DTIs Exceeded
              Guidelines .................................................................................... 38

           3.  Credit Inquiries Indicated Misrepresentations of Debts .............. 39

b.   Originators of the Loans in the NovaStar Trusts Systematically Disregarded NMI's Underwriting Guidelines Throughout the Relevant Period ................................................................................ 40

2.   The Registration Statements' Statistical Data Concerning LTV Ratios Were Materially False or Misleading ............................................. 42

3.   The Collapse of the NovaStar Bonds' Credit Ratings Shows that the Rating Agencies Were Provided False Information About the Underlying Loans ................................................................................ 44

D.  Wells's Failure to Conduct Proper Due Diligence on the Registration Statements ............... 47

E.  Freddie Mac Was Damaged by Wells's Section 11 Violations ................................................ 52

CAUSE OF ACTION ................................................................................................................... 53

PRAYER FOR RELIEF ................................................................................................................ 55

JURY TRIAL DEMAND .............................................................................................................. 55

Plaintiff Federal Housing Finance Agency, in its capacity as Conservator ("Plaintiff" or "FHFA") of the Federal Home Loan Mortgage Corporation ("Freddie Mac"), by its attorneys McKool Smith, P.C., as and for its complaint against Wells Fargo Securities, LLC, f/k/a Wachovia Capital Markets, LLC ("Wells"), alleges as follows:

## NATURE OF THE ACTION

1.      This action arises from the false and misleading statements and omissions contained in certain registration statements filed with the Securities and Exchange Commission (the "SEC"), pursuant to which Freddie Mac purchased certain residential mortgage-backed securities ("RMBS") underwritten by Wells and others.  Among other things, the registration statements falsely represented that the mortgage loans underlying the RMBS complied with certain underwriting guidelines and standards, and presented a false picture of the characteristics and riskiness of those loans.  These representations were material to Freddie Mac, as they would have been to any reasonable investor, and their falsity violates Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k.  As a joint lead manager and underwriter for the RMBS issuances, Wells participated in the drafting and/or dissemination of the false and misleading registration statements, was responsible for conducting due diligence on the registration statements and ensuring the accuracy of the representations contained therein, and is now liable under Section 11 for the damages Freddie Mac suffered by virtue of the false registration statements.

2.      As part of its investment portfolio, Freddie Mac purchased certificates from the senior AAA-rated tranche[1] of offerings of certain "private label" RMBS ("PLS").  In 2006, NovaStar Mortgage, LLC, f/k/a NovaStar Mortgage, Inc. ("NMI"), sponsored several issuances

---

[1]      A tranche is one of the classes of debt securities issued as part of a single transaction. Securities are often issued in tranches to meet different investor objectives.

of PLS, including the NovaStar Mortgage Funding Trust, Series 2006-3 (the "NovaStar 2006-3 Trust"), that issued the NovaStar Home Equity Loan Asset-Backed Certificates, Series 2006-3 (the "NHEL 2006-3 Certificates"), and the NovaStar Mortgage Funding Trust, Series 2006-6 (the "NovaStar 2006-6 Trust"), that issued the NovaStar Home Equity Loan Asset-Backed Certificates, Series 2006-6 (the "NHEL 2006-6 Certificates").[2]  In 2006, Freddie Mac purchased bonds from the senior, AAA-rated tranches of the NHEL Certificates:  CUSIP 66988WAA4 from the A-1A tranche of the NHEL 2006-3 Certificates and CUSIP 66988RAA5 from the A-1A tranche of the NHEL 2006-6 Certificates (together, the "NovaStar Bonds").[3]  Freddie Mac still holds those NovaStar Bonds, which, together, had an original face value in excess of $1 billion.

3.      The registration statements for the NHEL Certificates (each a "Registration Statement" and, together, the "Registration Statements") consisted of a "Shelf Registration Statement," a "Prospectus," and a "Prospectus Supplement" filed with the SEC.  The Registration Statements contained representations concerning, among other things, the characteristics and credit quality of the mortgage loans underlying the NHEL Certificates, the creditworthiness of the borrowers on those underlying mortgage loans, and the origination and underwriting practices used to make and approve the loans.  Such representations were material to a reasonable investor's decision to invest in the NHEL Certificates and they were material to Freddie Mac's decision to purchase the NovaStar Bonds.  Unbeknownst to Freddie Mac, many of those representations were materially false because, among other reasons, many of the underlying mortgage loans were not originated in accordance with the represented underwriting

---

[2]      The NovaStar 2006-3 Trust and NovaStar 2006-6 Trust, together, shall be referenced herein as the "NovaStar Trusts" and the NHEL 2006-3 Certificates and NHEL 2006-6 Certificates, together, shall be referenced herein as the "NHEL Certificates."

[3]      "CUSIP" refers to the Committee on Uniform Securities Identification Procedures, which assigns unique nine-digit, alphanumeric identifiers to securities.

standards and origination practices, and did not have the credit quality and other characteristics represented in the Registration Statements.

4.    Among other things, the Registration Statements represented that "[a]ll of the mortgage loans" in the NovaStar Trusts "were originated or purchased by [NMI]" and that all such loans were originated pursuant to NMI's guidelines.  The Registration Statements falsely represented that those guidelines were followed except in specified circumstances, when in fact the guidelines were systematically disregarded.

5.    A forensic review of statistically significant representative samples of 100 loan files from the NovaStar 2006-3 Trust and 456 loan files from the NovaStar 2006-6 Trust has revealed that, contrary to the representations in the Registration Statements, the vast majority of loans reviewed did not adhere to NMI's underwriting guidelines.  For example, the files for many loans:  (i) lack documentation necessary to underwrite the loan properly; (ii) include an invalid, incomplete, or unsupported appraisal; (iii) evidence the loan underwriter's failure to confirm the reasonableness of the borrower's stated income; or (iv) reflect that the borrower's income, FICO score,[4] debt, debt-to-income ratio ("DTI"),[5] or loan-to-value ("LTV") ratio are outside the range permitted under NMI's guidelines.  Adherence to underwriting guidelines, particularly on criteria bearing on loan eligibility, is a material consideration to reasonable investors.  Material discrepancies from underwriting guidelines are very serious, and investors should have been notified of the inclusion in the NovaStar Trusts of loans that failed to comply with NMI's guidelines.

---

[4]    FICO is a company that develops credit scores based upon "predictive analytics."  The name "FICO" comes from the company's original name, the Fair Isaac Co.

[5]    The DTI is calculated by dividing a borrower's monthly debt payments by the borrower's gross monthly income, and provides a measure of the borrower's ability to repay debt.

6.     The Registration Statements also set forth credit ratings for each tranche of NHEL Certificates in the NovaStar Trusts, including credit ratings of "AAA" or its equivalent for the NovaStar Bonds that Freddie Mac purchased.  Those AAA ratings were material to a reasonable investor's decision to purchase the NovaStar Bonds and they were material to Freddie Mac.  The size of the AAA tranches of an RMBS trust relative to the trust's other tranches depends upon the quality of the loans in the underlying pool.  Here, the AAA tranches for the NHEL Certificates in the NovaStar Trusts were based upon false information that NMI, its affiliates, and/or its underwriters like Wells had supplied to the credit rating agencies.  If the credit rating agencies had been provided accurate information about the loan pools, they would have required greater subordination for the AAA tranches, thereby reducing the size of the AAA tranches and making issuance of the NHEL Certificates, on the whole, less profitable and likely uneconomic. In that sense, the issuance of the NHEL Certificates depended upon surreptitiously foisting upon Freddie Mac losses in the loan pools beyond what its AAA NovaStar Bonds reflected.

7.     Underwriters like Wells purchase securities (*e.g.*, the NHEL Certificates) from an issuer (*e.g.*, the NovaStar Trusts) and resell them into the primary market of investors at a profit, known as the "underwriting spread."  Here, Wells purchased and resold approximately 28.7 percent, or $313 million worth, of the NHEL 2006-3 Certificates and approximately 29 percent, or $357 million worth, of the NHEL 2006-6 Certificates.  But Wells served as not just an underwriter, but also a "Joint Lead Manager" and "Joint Book-Runner" for the NHEL Certificates.  This meant that, together with the other Joint Lead Managers, Wells worked with NMI, NMI's affiliates, and the credit rating agencies to select the pool of mortgage loans underlying the NHEL Certificates and otherwise structure the transaction.  In addition, like all RMBS underwriters, Wells was obligated under the securities laws to conduct due diligence on

the loan pools to ensure that the Registration Statements' representations to the investing public about the pools were accurate and complete.

8.      Wells utterly failed in its legal obligation to ensure the accuracy of the NHEL Certificates' Registration Statements.  To the extent Wells conducted any due diligence at all on the NovaStar Trusts, the NHEL Certificates, and/or the Registration Statements, Wells neither believed nor had any basis from that due diligence to believe in the accuracy of the Registration Statements' representations, including whether the ratings supplied by the credit rating agencies were justified by the subordination levels based upon those representations.  The Registration Statements for the NHEL Certificates were false and Wells is liable as a matter of law for their falsity.

9.      The Registration Statements' misstatements and omissions of material facts have caused large financial losses to Freddie Mac.  As the truth concerning the misrepresented and omitted facts came to light, and as the hidden risks materialized, the market value of the NovaStar Bonds Freddie Mac purchased declined.  FHFA, as Conservator for Freddie Mac, now seeks damages from Wells for the losses Freddie Mac has suffered.

## PARTIES AND RELEVANT NON-PARTIES

### FHFA and Freddie Mac

10.     FHFA is an independent federal agency located at 400 7th Street, S.W., in Washington, D.C.  FHFA was created on July 30, 2008, pursuant to the Housing and Economic Recovery Act of 2008, Pub L. No. 110-289, 122 Stat. 2654, 12 U.S.C. § 4501 *et seq.* ("HERA"), to oversee Freddie Mac, the Federal National Mortgage Association ("Fannie Mae" and, with Freddie Mac, the "GSEs"), and the Federal Home Loan Banks.  On September 6, 2008, the Director of FHFA, pursuant to HERA, placed Freddie Mac into conservatorship and appointed

FHFA as Freddie Mac's Conservator.  As Conservator, FHFA immediately succeeded to (1) "all rights, titles, powers, and privileges" of Freddie Mac and its stockholders, directors, and officers, including all rights related to Freddie Mac's assets, and (2) all "title to the books, records, and assets" of any other legal custodian of Freddie Mac.  12 U.S.C. §§ 4617(b)(2)(A)(i), (ii).  In addition, as Conservator, FHFA was granted plenary power to, *inter alia*, "take over the assets of and operate" Freddie Mac, 12 U.S.C. § 4617(b)(2)(B)(i), "conduct all business of" Freddie Mac, *id*., "collect all obligations and money due" to Freddie Mac, *id.* § 4617(b)(2)(B)(ii), "perform all functions of [Freddie Mac] in the name of [Freddie Mac]," *id.* § 4617(b)(2)(B)(iii), "preserve and conserve the assets and property of" Freddie Mac, *id.* § 4617(b)(2)(B)(iv), and "take such action[s] as may be[] … appropriate to carry on the business of [Freddie Mac] and preserve and conserve [its] assets and property," *id.* § 4617(b)(2)(D)(ii).

11.     Freddie Mac is a government-sponsored enterprise chartered by Congress with a mission to provide liquidity, stability, and affordability to the United States housing and mortgage markets.  12 U.S.C. § 1451 *et seq*.  Freddie Mac is located at 8200 Jones Branch Drive in McLean, Virginia.

12.     By virtue of FHFA's conservatorship, Freddie Mac's legal claims relating to PLS Freddie Mac purchased, including Freddie Mac's legal claims relating to the NovaStar Bonds, have belonged to FHFA since September 6, 2008, the date FHFA was appointed Conservator of Freddie Mac.

**Defendant Wells**

13.     Defendant Wells is a Delaware limited liability company with its principal place of business at 550 South Tryon Street, Charlotte, North Carolina 28202, and an office at 375 Park Avenue, New York, New York 10152.  Wells is a wholly-owned subsidiary of Wells Fargo

& Company, a publicly traded corporation that maintains its principal offices at 420 Montgomery Street, San Francisco, California 94104.

14.     In 2006, when Freddie Mac purchased the NovaStar Bonds, Wells was known as Wachovia Capital Markets, LLC ("Wachovia Capital").  Wachovia Capital was an SEC-registered broker-dealer wholly-owned by Wachovia Corporation, was one of the leading PLS underwriters in the United States, and was an underwriter, joint lead manager, and joint book-runner for the NovaStar Trusts and the NHEL Certificates, including the NovaStar Bonds.  In its capacity as joint lead manager and underwriter for the NovaStar Trusts and the NHEL Certificates, Wachovia Capital participated in the selection of the mortgage loans underlying the NHEL Certificates, the structuring of transactions, and the dissemination of the false and misleading Registration Statements.  Wachovia Capital was also responsible for conducting due diligence on the Registration Statements and the NHEL Certificates, including the NovaStar Bonds, and was directly involved in the offer and sale of the NHEL Certificates to investors.

15.     In 2008, Wells Fargo & Company acquired Wachovia Corporation, the parent company of Wachovia Capital.  Wachovia Capital was thereafter rebranded as Wells, such that Wells now bears the liabilities of Wachovia Capital.

**The Non-Party NovaStar Entities**

16.     NovaStar Mortgage, LLC, f/k/a NovaStar Mortgage, Inc. ("NMI"), acted as the Sponsor for the NovaStar Trusts, originated or purchased all of the mortgage loans in the NovaStar Trusts that underlie the NHEL Certificates and the NovaStar Bonds, and initially served as Servicer of those mortgage loans post-securitization.

17.     After NMI originated or purchased the mortgage loans underlying the NHEL Certificates and the NovaStar Bonds, NMI conveyed those loans to affiliate NovaStar Mortgage

Funding Corporation ("NMFC") pursuant to mortgage loan purchase agreements. NMFC, a "special purpose entity" that acted as depositor of both NovaStar Trusts, among other PLS trusts, deposited the mortgage loan collateral into the NovaStar Trusts.

18. NMI and NMFC were subsidiaries of Novation Companies, Inc., f/k/a NovaStar Financial, Inc. ("NFI"). NMI originated more than $40 billion in mortgage loans and, at the height of its business, NMI originated more than $11 billion annually in mortgage loans. After many of NMI's loans failed during the financial crisis, NFI changed its name to Novation Companies, Inc., in 2012 and, on July 20, 2016, NFI, NMI, and NMFC filed for bankruptcy protection.

**The Non-Party Underwriters**

19. In addition to Wells, non-parties RBS Securities, Inc., f/k/a Greenwich Capital Markets, Inc. d/b/a RBS Greenwich Capital ("RBS"), and Deutsche Bank Securities, Inc. ("DB"), served as underwriters, "Joint Lead Managers," and "Joint Book-Runners" for the NHEL Certificates, including the NovaStar Bonds. Morgan Stanley & Co. Incorporated ("Morgan Stanley") also served as an underwriter and "Co-Manager" of the NHEL 2006-3 Certificates. Together, Wells, RBS, DB and, for the NHEL 2006-3 Certificates only, Morgan Stanley will be referenced herein as the "Underwriters."

## JURISDICTION AND VENUE

20. This Court has subject matter jurisdiction pursuant to i) 28 U.S.C. § 1345, which gives federal courts original jurisdiction over claims FHFA brings in its capacity as Conservator of Freddie Mac; ii) 28 U.S.C. § 1331, because the Securities Act claims asserted herein arise under Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k; and iii) Section 22 of the Securities Act of 1933, 15 U.S.C. § 77v.

21.     This Court has personal jurisdiction over Wells because Wells regularly transacts business and provides services in New York and maintains an office in this District for doing so, and because many of the acts and transactions alleged herein occurred in New York.

22.     Venue is proper in this District pursuant to Section 22 of the Securities Act of 1933, 15 U.S.C. § 77v, and 28 U.S.C. § 1391(b)(1).  Wells is present in this District by virtue of its corporate office within the District, located at 375 Park Avenue, New York, New York 10152.  Additionally, Wells transacts business within the District and many of the acts and transactions alleged herein, including the preparation and dissemination of the Registration Statements, occurred in substantial part within this District.

## TIMELINESS OF THE INSTANT ACTION

23.     The limitations period governing FHFA's claim herein is governed by HERA, 12 U.S.C. § 4617(b)(12).  *See Fed. Hous. Fin. Agency v. UBS Ams. Inc.*, 712 F.3d 136, 143-44 (2d Cir. 2013) ("[W]e hold that § 4617(b)(12) of HERA applies to this action and supplants any other time limitations that otherwise might have applied.").  HERA contains no period of repose.

24.     This action is timely because of i) an August 2, 2011 tolling agreement, as amended, among FHFA, Freddie Mac, and Fannie Mae, on the one hand, and Wells and its affiliates, on the other hand, that tolled the running of the statute of limitations with respect to 38 different PLS bonds that were issued or underwritten by Wells, including the NovaStar Bonds (the "First Tolling Agreement"), ii) a subsequent tolling agreement, effective as of May 3, 2019, among FHFA, Freddie Mac, and Wells and its affiliates that tolled the running of the statute of limitations with respect to the NovaStar Bonds (the "Second Tolling Agreement," and together with the First Tolling Agreement, the "Tolling Agreements"), and iii) the "*American Pipe* doctrine," *see American Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 554 (1974) (holding that "the

commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action").

**The Class Action**

25.     On May 21, 2008, New Jersey Carpenters Health Fund, on behalf of itself and all others similarly situated ("Class Plaintiff"), commenced a putative class action against the sponsor, issuer, and underwriters of six PLS, including the NovaStar Trusts, the NHEL Certificates and the NovaStar Bonds, asserting claims under the 1933 Securities Act. *See New Jersey Carpenters Health Fund, On Behalf Of Itself And All Others Similarly Situated, v. Novastar Mortgage, Inc.*, No. 08 Civ. 5310 (S.D.N.Y.) (Batts, J.) (the "Class Action").  The Class Action was brought on behalf of, and sought to certify a class of, holders of six PLS, including the NovaStar Trusts, the NHEL Certificates, and the NovaStar Bonds, who purchased their bonds prior to May 21, 2008.  Wells is a defendant in that Class Action.

26.     Freddie Mac purchased its NHEL 2006-3 bond on June 29, 2006 and its NHEL 2006-6 bond on November 30, 2006, and thereby ostensibly fell within the putative class.  Upon FHFA's appointment as Conservator on September 6, 2008, however, all of Freddie Mac's legal claims relating to its purchase of the NovaStar Bonds became the sole property of FHFA as Conservator.

27.     On February 23, 2017, the named plaintiff and defendants in the Class Action reached an agreement in principle to settle the Class Action (the "Class Settlement").  On March 9, 2017, the District Court issued an Order Preliminarily Approving the Settlement, Certifying Settlement Class, Approving Notice to the Class, and Scheduling Final Approval Hearing (the "Preliminary Approval Order").  On August 30, 2017, FHFA and Freddie Mac objected to the

Class Settlement on the grounds, among others, that HERA § 4617(f) prohibits the District Court from including FHFA and Freddie Mac in the class because doing so would release claims belonging to FHFA without FHFA's consent.  Over FHFA's and Freddie Mac's objection, the District Court approved the Class Settlement on March 7, 2019, and entered Judgment on March 13, 2019.  On March 26, 2019, FHFA and Freddie Mac appealed the Class Action Judgment to the United States Court of Appeals for the Second Circuit.  *See New Jersey Carpenters Health Fund v. The Royal Bank of Scotland Grp. PLC, et al.*, No. 19-cv-763 (2d Cir. 2019).

28.     While Paragraph 27 of the Preliminary Approval Order purported to enjoin each class member (including Freddie Mac) and anyone acting on its behalf (including FHFA) from commencing any action relating to the NovaStar Bonds, that injunction was only effective "[u]pon the date for publishing the Summary Notice, pending final determination of whether Settlement should be approved[.]"  The March 13, 2019 Judgment constituted that "final determination" (*see* Judgment, ¶ 6) and its entry dissolved the Preliminary Approval Order's injunction.

29.     Upon "the Effective Date" of the Judgment, the Judgment also purports to enjoin each class member (including Freddie Mac) and anyone acting on its behalf (including FHFA) from commencing any action relating to the NovaStar Bonds, and to release all claims against Wells relating to the NovaStar Bonds.  The "Effective Date," however, is the date upon which "[t]he Judgment has become Final."  The Judgment defines "Final" to mean, "with respect to any court order, including[] … the Judgment, that such order … is not subject to further review on appeal …."  Because Freddie Mac and FHFA have appealed from the Judgment, the Effective

Date has not yet occurred and neither the Judgment's release nor its injunction is currently in effect.

30.     FHFA's claims on Freddie Mac's behalf have remained tolled under the *American Pipe* doctrine by virtue of Freddie Mac's continued inclusion in the Class Action and final Class Settlement.  If Freddie Mac is removed from the Class Action by virtue of the appeal or otherwise, FHFA's statute of limitations under HERA will only then begin to run with respect to its claim regarding the NovaStar Bonds.

**The Tolling Agreements**

31.     In addition to the *American Pipe* tolling, the limitations period governing FHFA's claim was tolled by the Tolling Agreements.  When the First Tolling Agreement was entered on August 2, 2011, there were at least 35 days left in HERA's limitations period (*i.e.*, from August 2, 2011 to September 6, 2011, three years from FHFA's appointment as Conservator).  Prior to the expiration date of the First Tolling Agreement, and on ten successive times thereafter, the parties to the First Tolling Agreement extended its term through amendments.  In the Eleventh Amendment, dated March 29, 2018, the First Tolling Agreement's term was extended through and including April 1, 2019 at 5:00 p.m.

32.     After the First Tolling Agreement expired on April 1, 2019, the Parties entered the Second Tolling Agreement, effective May 3, 2019, which tolled the limitations period with respect to the NovaStar Bonds until June 3, 2019.  When the Second Tolling Agreement was entered on May 3, 2019, there were at least three days left in HERA's limitations period.

33.     During the term of the Tolling Agreements, FHFA, Fannie Mae, Freddie Mac, and Wells settled or otherwise resolved claims relating to 36 of the 38 PLS bonds covered by the Agreement, such that the only two PLS bonds covered by the Tolling Agreements on which

Wells still has liability to FHFA and Freddie Mac are the NovaStar Bonds that are the subject of this complaint.

34.     FHFA did not previously sue Wells with respect to the NovaStar Bonds because it had agreed in the First Tolling Agreement not to file or assert any claims with respect to the 38 PLS bonds covered by the Agreement during its term.  While Wells was negotiating and executing amendments to the Tolling Agreement with FHFA and Freddie Mac, however, Wells simultaneously sought to release FHFA's and Freddie Mac's claims with respect to the NovaStar Bonds through the Class Settlement.

35.     Even without regard to the tolling under *American Pipe*, FHFA's instant action regarding the NovaStar Bonds is timely under the Tolling Agreements.

## FACTUAL ALLEGATIONS

### A.     The NovaStar Trusts

#### 1.     Residential Mortgage-Backed Securitizations Generally

36.     Asset-backed securitization involves pooling cash-producing financial assets and issuing securities backed by those pools of assets.  In a residential mortgage-backed securitization, the cash-producing financial assets are residential mortgage loans.

37.     RMBS can be divided into "agency RMBS," on the one hand, and "non-agency RMBS" (or PLS), on the other.  Agency RMBS are those created and issued by the GSEs or the Government National Mortgage Association (a/k/a "Ginnie Mae") from mortgage loans that comply with the requirements of those agencies.  In contrast, PLS, such as the NHEL Certificates and NovaStar Bonds at issue here, are RMBS created and issued by private financial institutions from mortgage loans that are not required to comply with GSE underwriting guidelines.

38.     In the most common form of PLS securitization, an entity known as a "sponsor" first acquires or originates mortgage loans.  The sponsor then creates a "depositor," which is

typically a bankruptcy-remote special purpose entity, and the sponsor, depositor and others establish a trust pursuant to a pooling and servicing agreement or trust indenture.  The sponsor typically transfers the mortgage loans to the trust in a two-step process by which (i) the sponsor first transfers the loans to the depositor and (ii) the depositor then transfers the assets to the trust. Pursuant to a registration statement filed with the SEC – including a prospectus that describes the general structure of the investment and prospectus supplements that are supposed to describe the mortgage loan collateral – the trust then issues certificates, or RMBS, that are backed by the mortgage loans in the trust.

39.     Underwriters typically purchase the RMBS trust's certificates and then offer, sell, or distribute the certificates to investors.  The trust uses the cash from its sale of certificates to the underwriters to pay for the purchase of the mortgage loans in the trust.  Investors that purchase the certificates are then paid principal and interest derived from a share of the principal and interest payments generated by the mortgage loans in the trust.

40.     RMBS trusts often issue different tranches of RMBS certificates to meet different investor objectives.  Moreover, some residential mortgage-backed securitizations are created from more than one collateral group of loans, in which case the trust issues different tranches of certificates backed by different groups of loans, each called a "supporting loan group."  For example, a securitization may involve two groups of mortgage loans, with some certificates backed primarily by the first supporting loan group, and others backed primarily by the second supporting loan group.  Owners of certificates backed by a particular supporting loan group are primarily dependent upon the cash flows from the mortgage loans in their supporting loan group for the payment of principal and interest on their certificates, but may have a contingent right to receive certain amounts from other supporting loan groups.

41.     RMBS sponsors and/or underwriters typically retain credit rating agencies – including Moody's Investors Service ("Moody's"), Standard & Poor's ("S&P"), and Fitch Ratings – to assign ratings to the different RMBS tranches prior to issuance.

42.     Each credit rating agency employs its own scale with letter designations to describe various levels of risk, but, in general, AAA or its equivalent ratings are at the top of the credit rating scale and are intended to designate the safest investments.  In contrast, C and D ratings are at the bottom of the scale and refer to investments that are currently in or almost in default and exhibit little or no prospect for principal recovery from losses.  When Freddie Mac purchased its AAA-rated NovaStar Bonds, investments with AAA or its equivalent ratings historically experienced a loss rate of less than 0.05 percent.  Investments with a BBB rating or its equivalent historically experienced a loss rate of less than one percent.  As a result, securities with credit ratings between AAA (or equivalent) through BBB- (or its equivalent) were generally referred to as "investment grade."  For almost a hundred years, investors such as pension funds, municipalities, insurance companies, and university endowments have relied heavily on credit ratings to assist them in distinguishing between safe and risky investments.

43.     To obtain credit ratings for the different tranches of an RMBS trust, the RMBS sponsor and/or underwriters provide the credit rating agencies with information about the pool of mortgage loans underlying the RMBS trust.  Credit rating agencies first analyze this information to determine the losses likely to be suffered by that pool.  To assign ratings for each tranche within the RMBS trust, the credit rating agencies then analyze how the expected losses within the pool of mortgage loans are likely to be suffered by each tranche, based upon the structure of the RMBS trust and its credit enhancements, such as "subordination," "overcollateralization," and "excess spread."

44.     Subordination refers to the fact that, like the NHEL Certificates, RMBS certificates are issued in a hierarchical structure, from senior tranches to junior tranches, specifically to make the senior certificates safer investments.  RMBS trust payments are distributed in a "waterfall," with the most senior tranche of certificates paid its interest and principal first, the next-most-senior tranche paid its interest and principal, and, in descending order, each more junior tranche paid its interest and principal only after the tranche immediately above it has been paid in full.  As a result, if, because of delinquencies in payments on the underlying mortgages or otherwise, there is a shortfall in the payments to the trust, any shortfall in payments from the trust to certificateholders will be borne by the most junior tranche(s) of certificates first, with greater shortfalls applied in ascending order.  At the same time, if there are defaults in the trust's mortgage loans, the losses are applied to the most junior tranche until those certificates reach a $0 principal balance, and are then applied to the next-most-junior tranche in like fashion, also in ascending order.  In this sense, each tranche of RMBS certificates is "subordinate" to the tranche(s) senior to it, specifically to lower the risk of the more senior certificates.  Stated otherwise, because of subordination, the most senior tranche of RMBS certificates is supposed to be the least risky, with riskiness increasing in descending order.[6]

45.     The degree to which subordination and other credit enhancements provide a credit "cushion" and protect the senior certificates from losses determines the size of the tranche(s) that credit rating agencies will assign AAA ratings.  All other things being equal, to the extent credit rating agencies deem the loans in a trust more likely to incur losses, the agencies are more likely

---

[6]     Overcollateralization involves the use of excess collateral, and is achieved when the value of assets in the pool is greater than the amount of the securities issued.  Excess spread, meanwhile, refers to a structure whereby the yield produced by payments into the trust exceeds the payments owed to investors as well as other expenses.

to determine that the senior tranches would need higher levels of credit enhancement, including greater subordination relative to junior tranches, to ensure payment to senior certificateholders and justify a AAA rating or its equivalent.  In contrast, all other things being equal, to the extent credit rating agencies deem the loans in a trust less likely to incur losses, the agencies are more likely to determine that the senior, AAA tranches would need lower levels of credit enhancement (*e.g.*, less subordination from junior tranches) to ensure payment to senior certificateholders and justify a rating of AAA or its equivalent.  Accordingly, the size of the AAA tranche relative to the other tranches depends upon the quality of the loans in the underlying collateral group and the entire securitization.

46.      A mortgage servicer manages the collection of proceeds from the mortgage loans. The servicer is responsible for collecting homeowners' mortgage loan payments, which the servicer remits to the trustee after deducting a monthly servicing fee.  The trustee (or trust administrator) administers the trust funds and delivers payments due each month on the certificates to the investors.

### 2.      The NovaStar Trusts, the NHEL Certificates, and the NovaStar Bonds

47.      This case involves the NovaStar Trusts, the NHEL Certificates, and the following NovaStar Bonds that Freddie Mac owns:

- On June 29, 2006, Freddie Mac purchased CUSIP 66988WAA4 from the A-1A tranche of the NHEL 2006-3 Certificates for the original face value of $599,172,000.  The A-1A tranche is primarily supported by Group I of the loans in the NovaStar 2006-3 Trust, but has a contingent right to receive certain amounts from the Group II mortgage loans.  Freddie Mac continues to hold this certificate.

- On November 30, 2006, Freddie Mac purchased CUSIP 66988RAA5 from the A-1A tranche of the NHEL 2006-6 Certificates for the original face value of $500,000,000.  The A-1A tranche is primarily supported by Group I of the loans in the NovaStar 2006-6 Trust, but has a contingent right to receive certain amounts from the Group II mortgage loans.  Freddie Mac continues to hold this certificate.

With respect to each of the NovaStar Trusts, Group I is referred to herein as the "Supporting Loan Group" and, together, the "Supporting Loan Groups."

### a.      The Registration Statements for the NHEL Certificates

48.      NMI, as Sponsor of the NovaStar Trusts, originated or purchased from other originators all of the mortgage loans underlying the NHEL Certificates.

49.      On or about May 25, 2006, NMI affiliates NMFC and NovaStar Certificates Financing Corporation ("NCFC") commenced the registration process for the NHEL Certificates by filing with the SEC a Form S-3, including an undated form Prospectus.  On June 16, 2006, NMFC and NCFC amended the Form S-3 by filing with the SEC a Form S-3/A, including a Prospectus dated June 16, 2006 (the "Shelf Registration Statement").

50.      Pursuant to a Notice of Effectiveness from the SEC, the Shelf Registration Statement became effective on June 20, 2006.

### 1.      The NovaStar 2006-3 Trust and NHEL 2006-3 Certificates

51.      On or about June 22, 2006, NMI, NMFC, and NFI entered into an "Underwriting Agreement" with the Underwriters with respect to the NHEL 2006-3 Certificates.  In the Underwriting Agreement, *inter alia*, NMI, NMFC, and NFI agreed to sell, and Wells and the other Underwriters agreed to buy and thereafter offer for sale, the NHEL 2006-3 Certificates.

52.      NMI, NMFC, NCFC and the Underwriters prepared a Prospectus Supplement dated June 22, 2006 on behalf of the NovaStar 2006-3 Trust for the NHEL 2006-3 Certificates, and, on or about June 28, 2006, NMFC and NCFC filed the June 22, 2006 Prospectus Supplement with the SEC.  The Prospectus Supplement identifies Wells as one of four underwriters for the NHEL 2006-3 Certificates.

53.      According to the June 22, 2006 Prospectus Supplement, it was a supplement to the June 16, 2006 Prospectus that was part of the Shelf Registration Statement.  Together, the

June 16, 2006 Shelf Registration Statement, the June 16, 2006 Prospectus, and the June 22, 2006

Prospectus Supplement constitute the Registration Statement for the NHEL 2006-3 Certificates.

54.     The NHEL 2006-3 Prospectus Supplement indicates that the Initial Aggregate

Certificate Balance of the NHEL 2006-3 Certificates was $1,089,000,000.  The A-1A Certificate

that Freddie Mac purchased comprised $599,172,000, or approximately 55 percent, of the entire

issuance.  The remaining approximately 45 percent of the issuance comprised A-2A Certificates

($122,600,000, or 11.3 percent); A-2B Certificates ($92,000,000, or 8.5 percent); A-2C

Certificates ($82,800,000, or 7.6 percent); A-2D Certificates ($25,228,000, or 2.3 percent); M-1

Certificates ($66,550,000, or 6.1 percent); M-2 Certificates ($18,150,000, or 1.7 percent); M-3

Certificates ($15,950,000, or 1.5 percent); M-4 Certificates ($15,950,000, or 1.5 percent); M-5

Certificates ($11,000,000, or 1 percent); M-6 Certificates ($9,350,000, or 0.9 percent); M-7

Certificates ($7,150,000, or 0.7 percent); M-8 Certificates ($9,350,000, or 0.9 percent); M-9

Certificates ($8,250,000, or 0.8 percent); and M-10 Certificates ($5,500,000, or 0.5 percent).

According to the Prospectus Supplement, the Class A Certificates are senior to the Class-M, or

"Mezzanine," Certificates, and the Mezzanine Certificates with lower numerical class

designations are senior to those Mezzanine Certificates with higher numerical class designations.

The Prospectus Supplement identifies the Class A-1A Certificates as the Group I Certificates

supported by Group I loans and the Class A-2A, Class A-2B, Class A-2C, and Class A-2D

Certificates as the Group II Certificates supported by Group II loans.

55.     The Prospectus Supplement indicates that Wells purchased $313 million worth, or approximately 28.7 percent, of the issuance, comprising approximately 29.1 percent of each of classes A-1A through M-8.[7]

56.     The Prospectus Supplement further represents that the A-1A, A-2A, A-2B, A-2C, and A-2D Certificates – comprising approximately 84.7 percent of the issuance – were rated "AAA" or its equivalent.

57.     On or about June 28, 2006, NMI, as Sponsor, entered into a Mortgage Loan Purchase Agreement (dated as of June 1, 2006) with, *inter alia*, NMFC, as Depositor, pursuant to which NMI sold NMFC the mortgage loans that would be deposited into the NovaStar 2006-3 Trust.  On or about the same date, NMI, as Sponsor and Servicer; NMFC, as Depositor; U.S. Bank National Association, as Custodian; JPMorgan Chase Bank, National Association, as Trustee; and JPMorgan Trust Company, National Association, as Co-Trustee, executed a Pooling and Servicing Agreement regarding the NovaStar 2006-3 Trust and the NHEL 2006-3 Certificates.

58.     On or about July 7, 2006, NMFC and NCFC filed with the SEC a Form 8-K on behalf of the NovaStar 2006-3 Trust for the NHEL 2006-3 Certificates, attaching, *inter alia*, the Underwriting Agreement, the Mortgage Loan Purchase Agreement, and the Pooling and Servicing Agreement for the issuance.

59.     Pursuant to Section 11 of the Securities Act of 1933, 15 U.S.C. §§ 77k(a)(5), (f)(1), Wells, as an underwriter of the NHEL 2006-3 Certificates, is liable in case any part of the Registration Statement for those Certificates contained an untrue statement of a material fact or

---

[7]     The Underwriters did not purchase the M-9 or M-10 Certificates.

omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

### 2.     The NovaStar 2006-6 Trust and NHEL 2006-6 Certificates

60.     On or about November 20, 2006, NMI, NMFC, and NFI entered into an "Underwriting Agreement" with Wells and the other Underwriters with respect to the NHEL 2006-6 Certificates.  In the Underwriting Agreement, *inter alia*, NMI, NMFC, and NFI agreed to sell, and Wells and the other Underwriters agreed to buy and thereafter offer for sale, the NHEL 2006-6 Certificates.

61.     NMI, NMFC, NCFC and the Underwriters prepared a Prospectus Supplement dated November 20, 2006 on behalf of the NovaStar 2006-6 Trust for the NHEL 2006-6 Certificates, and, on or about November 29, 2006, NMFC and NCFC filed the November 20, 2006 Prospectus Supplement with the SEC.  The Prospectus Supplement identifies Wells as one of three underwriters for the NHEL 2006-6 Certificates.

62.     According to the November 20, 2006 Prospectus Supplement, it was a supplement to the June 16, 2006 Prospectus that was part of the Shelf Registration Statement.  Together, the June 16, 2006 Shelf Registration Statement, the June 16, 2006 Prospectus, and the November 20, 2006 Prospectus Supplement constitute the Registration Statement for the NHEL 2006-6 Certificates.

63.     The NHEL 2006-6 Prospectus Supplement indicates that the Initial Aggregate Certificate Balance of NHEL 2006-6 Certificates was $1,233,750,000.  The A-1A Certificate that Freddie Mac purchased comprised $500,000,000, or approximately 40.5 percent, of the entire issuance.  The remaining approximately 59.5 percent of the issuance comprised A-2A Certificates ($248,800,000, or 20.2 percent); A-2B Certificates ($112,800,000, or 9.1 percent); A-2C Certificates ($139,800,000, or 11.3 percent); A-2D Certificates ($45,475,000, or

3.7 percent); M-1 Certificates ($38,750,000, or 3.1 percent); M-2 Certificates ($33,750,000, or

2.7 percent); M-3 Certificates ($19,375,000, or 1.6 percent); M-4 Certificates ($17,500,000, or

1.4 percent); M-5 Certificates ($13,750,000, or 1.1 percent); M-6 Certificates ($12,500,000, or

1 percent); M-7 Certificates ($11,250,000, or 0.9 percent); M-8 Certificates ($9,375,000, or

0.8 percent); M-9 Certificates ($13,750,000, or 1.1 percent); M-10 Certificates ($10,625,000, or

0.9 percent); and M-11 Certificates ($6,250,000, or 0.5 percent).  According to the Prospectus

Supplement, the Class A Certificates are senior to the Mezzanine Certificates, and the Mezzanine

Certificates with lower numerical class designations are senior to those Mezzanine Certificates

with higher numerical class designations.  The Prospectus Supplement identifies the Class A-1A

Certificates as the "Group I Certificates" and the Class A-2A, Class A-2B, Class A-2C and

Class A-2D Certificates as the "Group II Certificates."

     64.    The Prospectus Supplement indicates that Wells purchased $358 million worth, or

approximately 29 percent, of the NHEL 2006-6 Certificates, comprising approximately

29.4 percent of each of classes A-1A through M-9.[8]

     65.    The Prospectus Supplement further represents that the A-1A, A-2A, A-2B, A-2C,

and A-2D Certificates – comprising approximately 84.9 percent of the issuance – were rated

"AAA" or its equivalent.

     66.    On or about November 30, 2006, NMI, as Sponsor; NMFC, as Depositor; U.S.

Bank National Association, as Custodian; and Deutsche Bank National Trust Company, as

Trustee, executed a Mortgage Loan Purchase Agreement (dated as of November 1, 2006),

pursuant to which, *inter alia*, NMI sold NMFC the mortgage loans that would be deposited into

the NovaStar 2006-6 Trust.  On or about the same date, NMFC, as Depositor; NMI, as Sponsor

---

[8]    The Underwriters did not purchase the M-10 or M-11 Certificates.

and Servicer; U.S. Bank National Association, as Custodian; and Deutsche Bank National Trust Company, as Trustee, executed a Pooling and Servicing Agreement (dated as of November 1, 2006) regarding the NovaStar 2006-6 Trust and the NHEL 2006-6 Certificates.

67.     On or about December 6, 2006, NMFC and NCFC filed with the SEC a Form 8-K on behalf of the NovaStar 2006-6 Trust for the NHEL 2006-6 Certificates, attaching, *inter alia*, the relevant Underwriting Agreement, the Mortgage Loan Purchase Agreement, and the Pooling and Servicing Agreement.

68.     Pursuant to Section 11 of the Securities Act of 1933, 15 U.S.C. §§ 77k(a)(5), (f)(1), Wells, as an underwriter of the NHEL 2006-6 Certificates, is liable in case any part of the Registration Statement for those Certificates contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

### b.     The Sale of the NHEL Certificates

69.     Following registration of the NHEL Certificates, the NovaStar Trusts issued the NHEL Certificates, including the NovaStar Bonds.  Pursuant to the Underwriting Agreements, the NovaStar Trusts transferred the NHEL Certificates, including the NovaStar Bonds, to the Underwriters.  Pursuant to the Registration Statements, including the Prospectuses and Prospectus Supplements, Wells and the other Underwriters sold the NHEL Certificates in the primary market to investors, including the NovaStar Bonds sold to Freddie Mac.

70.     The Prospectus Supplements for the NHEL Certificates describe the loan underwriting guidelines that purportedly were used in connection with the origination of the mortgage loans underlying those Certificates.  In addition, those Prospectus Supplements pretend to provide accurate statistics regarding the mortgage loans in each Supporting Loan Group, including, for example:  the ranges of and weighted average FICO credit scores of the borrowers;

the ranges of and weighted average LTV ratios of the loans; the ranges of and weighted average outstanding principal balances of the loans; the geographic distribution of the loans; the extent to which the loans were for purchase or refinance purposes; information concerning whether the loans were secured by a property to be used as a primary residence, second home, or investment property; and information concerning whether the loans were delinquent.

71.    The NHEL Certificates, including the NovaStar Bonds, entitle their holders on a monthly basis to a specified portion of the cash flows from the mortgage loans in their Supporting Loan Group.  As a result, the true value of the NovaStar Bonds is derived from the likelihood that the Bonds will pay the principal and interest that they should, which depends, in turn, upon the credit quality of the mortgage loans in their Supporting Loan Groups – *i.e.*, the likelihood that those loans will pay principal and interest as required and, conversely, the risk of default by the borrowers and the likely recovery value upon default.

**B.    Representations in the Registration Statements**

72.    While FHFA relies for its claims upon the Registration Statements in their entirety, specific representations in the Registration Statements that illustrate some of the bases for FHFA's claims herein are set forth below.

**1.    Representations Regarding Compliance with NMI's Guidelines**

73.    The Registration Statements represented that "[a]ll of the mortgage loans" in the NovaStar Trusts "were originated or purchased by [NMI]" and that all such loans were originated pursuant to NMI's guidelines.  These guidelines were intended to assess the creditworthiness of the borrower, the ability of the borrower to repay the loan, and the adequacy of the mortgaged property as security for the loan.  Because payment on, and the value of, the NovaStar Bonds is based upon the cash flows from the underlying mortgage pool, representations concerning compliance with the stated underwriting guidelines were material to

-24-

reasonable investors. Investors, including Freddie Mac, did not have access to the collateral pool or other information about that collateral, but were required to rely on the representations in the Prospectus Supplements concerning that collateral. As explained below, a reasonable investor would not have understood, in light of the representations regarding supposed adherence to underwriting guidelines, that there were pervasive and systemic breaches of those guidelines with respect to the securitized loans.

74. Among other consequences, the failure to originate mortgage loans in accordance with stated guidelines diminished the value of the NovaStar Bonds by increasing the significant risk that an investor would not be paid its principal and interest. Misrepresentations concerning, or the failure to disclose accurately information regarding, characteristics of the borrower, the loan, or the property bear on the actual risk of default by the borrower, as well as the severity of losses given default, and such misrepresentations or omissions artificially inflate the perceived value of RMBS to the detriment of the reasonable investor. Without accurate information regarding the collateral pool, reasonable investors, including Freddie Mac, are unable to accurately and independently assess whether the price of an RMBS adequately accounts for the risks they are assuming when they purchase the security.

75. The Prospectuses and Prospectus Supplements for the NHEL Certificates contained detailed descriptions of the NMI underwriting guidelines used to originate the mortgage loans included in the NovaStar Trusts. For example, both Prospectus Supplements explained, in a similar manner, that all loans were subject to certain minimum underwriting standards requiring a loan application, credit reports and appraisals as follows:

**Underwriting Standards for the Mortgage Loans**

The underwriting guidelines of the sponsor are intended to evaluate the credit history of the potential borrower, the

capacity and willingness of the borrower to repay the loan and the adequacy of the collateral securing the loan. **Each loan applicant completes an application that includes information with respect to the applicant's income, liabilities and employment history. Prior to issuing an approval on the loan, the loan underwriter runs an independent credit report or pulls a reissue of the clients credit through an independent 3rd party vendor, which provides detailed information concerning the payment history of the borrower on all of their debts to verify that the information submitted by the broker is still accurate and up to date. An appraisal is also required on all loans and in many cases a review appraisal or second appraisal may be required depending on the value of the property and the [loan] underwriter's comfort with the original valuation. All appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and are generally on forms acceptable to Fannie Mae. The properties securing the mortgage loans are appraised by qualified independent appraisers who are generally approved by the related originator.** A streamline appraisal program is offered by our Retention division for borrowers that currently have a mortgage loan with the sponsor. Under this program an AVM can be used to determine valuation if the full appraisal from the previous loan is less than two years old. The maximum increase in value that can be supported with an AVM is 10%. The mortgagor may also include information regarding verification of deposits at financial institutions where the mortgagor had demand or savings accounts. In the case of investment properties, income derived from the mortgaged property may have been used for underwriting purposes.

(NHEL 2006-3 Pro. Supp. at S-78; NHEL 2006-6 Pro. Supp. at S-71) (emphasis added.)

76.    More specifically, the Prospectus Supplements explained, in identical manner, that the underlying mortgage loans had been originated pursuant to six loan documentation programs in NMI's underwriting guidelines. "Full Documentation" loans were the most rigorous in terms of the borrower documentation and required supporting documentation relating to the borrower's income, assets and employment, whereas "No Documentation loans" and "No Income and No Asset" were the least rigorous. Thus, according to the Prospectus Supplements:

The underwriting guidelines include six levels of applicant documentation requirements, referred to as "Full Documentation," "Limited Documentation," "Stated Income," "No Documentation," "No Income/No Asset," "Streamline" and "Full Doc/12-Month Personal Bank Statement." **Under the Full Documentation program applicants generally are required to submit verification of employment and most recent pay stub or up to prior two years W-2 forms and most recent pay stub.** Under the Limited Documentation program, no such verification is required, however, bank statements for the most recent consecutive 6-month period are required to evidence cash flow. Under the Stated Income program, an applicant may be qualified based on monthly income as stated in the loan application. Under the No Documentation program, an applicant provides no information as it relates to their income. Under the No Income/No Asset program, the applicant's income and assets are not verified, however the applicant's employment is verified.

(NHEL 2006-3 Pro. Supp. at S-79; NHEL 2006-6 Pro. Supp. at S-72) (emphasis added.)

77.     The Prospectus Supplements also explained that the majority (approximately 52 percent) of the collateral in the NovaStar Trusts was composed of the most rigorous "Full Documentation" loans. (NHEL 2006-3 Pro. Supp. S-28; NHEL 2006-6 Pro. Supp. S-27.) The Prospectus Supplements each make clear that, for any loan underwritten pursuant to the Full Documentation program, "applicants generally are required to submit verification of employment and most recent pay stub or the prior two years W-2 forms and most recent pay stub." (NHEL 2006-3 Pro. Supp. at S-79; NHEL 2006-6 Pro. Supp. at S-72.) The next largest category of mortgage loans after Full Documentation loans was the Stated Income/Stated Asset loan category, where, at a minimum, the borrower's stated income was required to be reasonable in relation to the borrower's employment. Stated Income loans accounted for approximately 40 percent of the mortgage loans underlying the NovaStar Trusts. (NHEL 2006-3 Pro. Supp. S-28; NHEL 2006-6 Pro. Supp. S-27.) The Prospectus Supplements also stated that relatively small percentages (approximately 7.5 percent) of the mortgage loans underlying the NHEL

Certificates were "No Documentation Loans."  (NHEL 2006-3 Pro. Supp. S-28; NHEL 2006-6 Pro. Supp. S-27.)

78.     In addition, the Prospectus Supplements emphasized that there was a hierarchy of senior NMI representatives who reviewed any deviations from or exceptions to the underwriting guidelines to ensure that any such deviations or exceptions were reasonably related to the underlying goals of including creditworthy borrowers ready and able to repay the mortgage obligations:

> On a case-by-case basis, exceptions to the underwriting guidelines are made where the sponsor believes compensating factors exist.  Compensating factors may consist of factors like length of time in residence, lowering of the borrower's monthly debt service payments, the loan-to-value ratio on the loan, as applicable, or other criteria that in the judgment of the loan underwriter warrant an exception.  All loans in excess of $350,000 currently require the approval of the underwriting supervisor or designee approved by the supervisor.  All loans over $650,000 require the approval of the VP of Operations and Corporate Credit Department or its approved designees.  In addition, the President of the sponsor approves all loans in excess of $1,100,000.

(NHEL 2006-3 Pro. Supp. at S-79; NHEL 2006-6 Pro. Supp. at S-72 (requiring VP of Operations approval for loans over $750,000).)

79.     The Prospectus Supplements further describe the existence of quality control reviews that ensured that the mortgage loan collateral complied with the underwriting guidelines:

> **Quality control reviews are conducted to ensure that all mortgage loans meet quality standards**.  The type and extent of the reviews depend on the production channel through which the mortgage loan was obtained and the characteristics of the mortgage loan.  The sponsor reviews, at a minimum, 7% of each month's production.  The random audit selection criteria includes a proportional representation of loan type, loan product, loan purpose, FICO score, LTV, underwriting grade, state and broker.

(NHEL 2006-3 Pro. Supp. at S-82; NHEL 2006-6 Pro. Supp. at S-75 (providing for sponsor reviews of, at a minimum, 8-10% of each month's production) (emphasis added).

80.     The Prospectus Supplements also guaranteed the legality of the origination of the mortgage loans:

> The sponsor will represent that as of the Closing Date or the Subsequent Transfer Date, as applicable, each mortgage loan originated by it is in compliance with applicable federal and state laws and regulations.

(NHEL 2006-3 Pro. Supp. at S-21; NHEL 2006-6 Pro. Supp. at S-21.)

81.     The Prospectus Supplements specifically represented that the Supporting Loan Groups "will consist exclusively of mortgage loans that conform to certain agency guidelines …." (NHEL 2006-3 Pro. Supp. at S-41; NHEL 2006-6 Pro. Supp. at S-38.) The term "agency guidelines" as used in the RMBS market generally refers to guidelines compliant with GSE requirements for mortgage loan underwriting. When the NHEL Certificates were issued, the GSEs, including Freddie Mac, could only buy RMBS that were based on mortgage loans originated in accordance with their guidelines. To sell RMBS to Freddie Mac, underwriters and sponsors commonly divided RMBS deals into two loan groups: Group I for "agency loans" (*i.e.*, loans underwritten in accordance with agency guidelines) and Group II for "non-agency loans." Typically, underwriters and sponsors designed and sold bonds based on Group I loans exclusively to the GSEs, including Freddie Mac. Upon information and belief, Wells and the other participants in the creation and securitization of the NHEL Certificates specifically designed the Supporting Loan Groups here to be securitized for sale to Freddie Mac, and knew that Freddie Mac would not have purchased the NovaStar Bonds but for the representations in the Registration Statements that the Supporting Loan Groups were originated in accordance with agency guidelines.

82.     Contrary to these representations in the Prospectus Supplements, however, originators of the loans in the NovaStar Trusts routinely and egregiously departed from, or

abandoned completely, NMI's underwriting guidelines, as alleged in Section C.1 *infra*.  As a result, the representations concerning compliance with underwriting guidelines and the inclusion and descriptions of those guidelines in the Prospectus Supplements were false and misleading, and the actual mortgage loans underlying the NHEL Certificates and NovaStar Bonds exposed the purchasers, including Freddie Mac, to a materially greater risk than was represented in the Prospectus Supplements.

83.     The inclusion of these representations in the Prospectus Supplements had the purpose and effect of providing assurances to investors regarding the quality of the mortgage collateral underlying the NHEL Certificates and NovaStar Bonds.  These representations were material to a reasonable investor's decision to purchase the NHEL Certificates, and they were material to Freddie Mac's decision to purchase the NovaStar Bonds.  As alleged more fully in Section C.1 *infra*, these representations were materially false.

### 2.     Representations Regarding LTV Ratios

84.     The loan-to-value, or LTV, ratio of a mortgage loan is the ratio of the balance of the mortgage loan to the value of the mortgaged property when the loan is made.

85.     The numerator in an LTV ratio is the amount of the loan at issue, while the denominator is the value of the mortgaged property – generally the lower of the purchase price or the appraised value of the property.  In a refinancing or home-equity loan, where there is no purchase price to use as the denominator, the LTV ratio's denominator is often equal to the appraised value of the mortgaged property at the time of the origination of the refinanced loan or home equity loan.  Accordingly, an accurate appraisal is essential to an accurate LTV ratio.  In particular, an inflated appraisal, by increasing the denominator of the ratio, will understate the LTV ratio, sometimes greatly, and thereby understate the risks associated with a given loan.

86.     The LTV ratio is among the most important measures of the risk of a mortgage

loan for several reasons.  First, the LTV ratio is a strong indicator of the likelihood of default,

because a higher LTV ratio makes it more likely that a decline in the value of a property will

eliminate a borrower's equity, and could incentivize the borrower to stop making mortgage

payments and abandon the property.  Second, the LTV ratio is a strong predictor of the severity

of loss in the event of a default because the higher the LTV ratio, the smaller the "equity

cushion," and the greater the likelihood that the proceeds of foreclosure will not cover the unpaid

balance of the mortgage loan.

87.     LTV ratios were material to a reasonable investor's decision to invest in the

NHEL Certificates, and they were material to Freddie Mac's decision to purchase the NovaStar

Bonds.  Even small differences between the LTV ratio of the mortgage loans in the collateral

group of a securitization have a significant effect on the likelihood that collateral groups will

generate sufficient funds to pay certificateholders in that securitization.  Such differences are

important to the decision of a reasonable investor to purchase any RMBS certificate, and they

affect the intrinsic value of the certificate.

88.     The Prospectus Supplements for the NHEL Certificates contain information about

the LTV ratios for each Supporting Loan Group.  Table 1 below reflects two categories of

important information reported in the Prospectus Supplements concerning the LTV ratios for

each Supporting Loan Group:  (i) the percentage of loans with an LTV ratio of less than or equal

to 80 percent; and (ii) the percentage of loans with an LTV ratio greater than 100 percent.[9]

---

[9]     Only the securitized lien is included in the numerator of the LTV.  Thus, as used herein,
"LTV ratio" refers to the LTV ratio for loans in the NovaStar Trusts secured by first lien
mortgages.  Where the mortgage lien for the securitized loan is junior to another loan, the loan
for the unsecuritized, more senior mortgage lien has been added to the securitized loan to

Table 1 uses an LTV ratio of 80 percent as the benchmark because, as a condition for making a mortgage loan, lenders traditionally required borrowers to make a down payment of at least 20 percent of the value of the property, which corresponds to an LTV ratio of less than or equal to 80 percent.  As Table 1 makes clear, the Prospectus Supplements for the NHEL Certificates reported that around half of the mortgage loans in the Supporting Loan Groups had LTV ratios of 80 percent or less, and that none of the Supporting Loan Groups contained a single loan with an LTV ratio over 100 percent:

**TABLE 1:  LTV Ratios Represented in Prospectus Supplements**

| Transaction | Supporting Loan Group | Percentage of loans, by aggregate principal balance, with LTV ratio less than or equal to 80 | Percentage of loans, by aggregate principal balance, with LTV greater than 100 |
|---|---|---|---|
| NHEL 2006-3 | Group 1 | 53.38% | 0.00% |
| NHEL 2006-6 | Group 1 | 50.06% | 0.00% |

(NHEL 2006-3 Pro. Supp. at S-42, S-48; NHEL 2006-6 Pro. Supp. at S-39, S-45.)

89.     As discussed in Section C.2 *infra*, the Prospectus Supplements for the NHEL Certificates materially overstated the percentage of loans in the Supporting Loan Groups with an LTV ratio at or less than 80 percent, and materially understated the percentage of loans in the Supporting Loan Groups with an LTV ratio over 100 percent, thereby misrepresenting the degree of risk to certificateholders.

**3.      Representations Regarding Credit Ratings**

90.     Each tranche of the NHEL Certificates received a credit rating before issuance, reported in the Prospectus Supplements, that purported to reflect the riskiness of that tranche.

---

determine the numerator in the LTV calculation.  This latter calculation is sometimes referred to as the combined-loan-to-value, or "CLTV," ratio.

For each of the NovaStar Bonds purchased by Freddie Mac, the credit rating provided was AAA (or its equivalent).  The credit quality of the NovaStar Bonds reflected by these ratings was material to a reasonable investor's decision to purchase the NovaStar Bonds and it was material to Freddie Mac.  Among other things, the AAA ratings provided additional assurance that investors in the NovaStar Bonds would receive the expected interest and principal payments.

91.     The Prospectus Supplements explained that, in the NovaStar Trusts, the AAA-rated Class A Certificates, including the NovaStar Bonds, are senior to the Mezzanine Certificates, and the Mezzanine Certificates with lower numerical class designations are senior to those Mezzanine Certificates with higher numerical class designations.  In the NovaStar Trusts, the AAA-rated Class A Certificates, including the NovaStar Bonds, comprised approximately 85% of each issuance, meaning that they had subordination from the approximately 15% of each issuance that constituted the Mezzanine Certificates.

92.     Upon information and belief, the subordination levels for the NovaStar Bonds were based upon the materially inaccurate and incomplete loan level information that was both provided to the rating agencies and used to produce the Registration Statements' disclosures.  If the credit rating agencies had been provided accurate information about the loan level information within the collateral pools, the subordination for the AAA tranches would have been greater, thereby reducing the size of the AAA tranches and making issuance of the NHEL Certificates, on the whole, less profitable and likely uneconomic.  As set forth in Section C.3 *infra*, after Freddie Mac's purchase of the NovaStar Bonds, the ratings for the NHEL Certificates were severely downgraded to well below "investment grade," reflecting the true risk of the NovaStar Bonds.

**C.**     **The Falsity of the Registration Statements' Representations**

93.     To assess whether the information in the Prospectus Supplements was true and accurate, Freddie Mac had statistically significant representative samples of mortgage loans drawn from the Supporting Loan Group of each of the NovaStar Trusts:  100 loans from the NovaStar 2006-3 Trust and 456 loans from the NovaStar 2006-6 Trust.  Freddie Mac then had analyses conducted on those representative samples.  The analyses confirmed that the Prospectus Supplements contained materially false and misleading representations regarding the mortgage loans in the Supporting Loan Groups of the NovaStar Trusts.  The material misrepresentations include false representations about the underwriting standards employed by the mortgage loan originators; false representations about the LTV ratios of the mortgage loans when the loans were originated and securitized; and false representations about other key characteristics of the mortgage loans.

**1.**     **NMI's Underwriting Guidelines Were Systematically Disregarded**

94.     As discussed in Section B.1 *supra*, the Prospectus Supplements for the NHEL Certificates state that all loans in the NovaStar Trusts were originated pursuant to NMI's guidelines.  This statement was materially false.

95.     That NMI's guidelines were systematically disregarded is confirmed by:  (a) a forensic review of loan files; (b) government investigations and private actions relating to RMBS underwriting practices, which have revealed widespread abandonment of reported underwriting guidelines during the period the NHEL Certificates were issued; (c) pervasively false LTV ratios; and (d) the collapse of the AAA credit ratings of the NovaStar Bonds that Freddie Mac purchased, which were caused by a surge in delinquencies and defaults among the mortgage loans in the NovaStar Trusts well beyond what NMI and/or the Underwriters originally represented to the credit rating agencies.

a.  **A Forensic Review of Loan Files Has Revealed**
**a Pervasive Failure to Adhere to NMI's Guidelines**

96.     The NMI guidelines were designed to assess the likelihood a borrower would be able to repay the loan.  The forensic review, however, has revealed that approximately 69.7 percent of a representative sample of 100 loans from the NovaStar 2006-3 Trust Supporting Loan Group and approximately 80.6 percent of a representative sample of 456 loans from the NovaStar 2006-6 Trust Supporting Loan Group had not been originated in accordance with NMI's underwriting guidelines.

97.     The forensic review consisted of an analysis of the loan origination file for each sampled loan, including the documents submitted by the individual borrowers in support of their loan applications, as well as an analysis of information extrinsic to each loan file, such as borrowers' filings in bankruptcy proceedings, motor vehicle registration, or other documentation, including post-closing and/or servicing materials where available.

98.     The results of the forensic review demonstrate the material falsity of the disclosures in the Registration Statements stating that the mortgage loans were originated pursuant to NMI's underwriting guidelines.  The forensic review revealed an abandonment of those underwriting guidelines, including:

- the absence of key documentation necessary to underwrite loans properly;

- invalid, incomplete, or unsupported appraisals;

- the failure to test the reasonableness of the borrower's stated income, contributing to material misrepresentations of income;

- the failure to calculate properly the borrower's outstanding debt, causing the DTI to exceed the maximum allowed under the underwriting guidelines;

- the failure to investigate properly information on the borrower's credit reports of potential misrepresentation of outstanding or potential debt; and

- the failure to verify the borrower's employment history and assets.

99.     The Prospectus Supplements represented that exceptions would be justified by sufficient compensating factors and approved by increasing seniority of officers, including NMI's president, based upon the size of the loan at issue.  In fact, however, none of the loan files reflecting a breach of underwriting guidelines evidenced sufficient compensating factors (as set forth in the underwriting guidelines) that would justify or support such an exception.  Similarly, the loan files lack any documentation reflecting whether or how the originators considered, if at all, such compensating factors.  In any event, loans failing to follow guidelines at a 70 percent rate could not possibly be explained by the proper application of any such exceptions.

100.    The following examples from the initial forensic review illustrate the types of breaches discussed above that pervade the loan pools of the NovaStar Trusts.

### 1.     Stated Incomes Were Not Reasonable

101.    Although no verification of income was required for stated income loans, the applicable underwriting guidelines required the loan underwriter to verify the employment listed by the borrower on the application and to assess whether the stated income was reasonable given the applicant's line of work.  The applicable NMI underwriting guidelines stated that, although not verified, "the income stated … will be used to qualify the Borrower provided the **income appears reasonable** for the nature and length of employment."  (NMI Underwriting Guidelines at § 3.3 (emphasis added).)  The loan underwriter was required, for W2 employees, to verify verbally one or two years of employment, depending upon the loan program, and, for self-employed borrowers, to obtain proof that a business existed for at least two years.  (*Id.*)

102.    The following examples reveal instances where there was no evidence that the loan underwriter analyzed the reasonableness of the borrower's stated income for the employment listed on the loan application, as required by the applicable underwriting guidelines. In fact, the forensic review verified that the borrower misrepresented his or her income on the

application.  This misrepresentation resulted in a miscalculation of the borrower's DTI.  Had the loan underwriter performed an evaluation of the income stated on the application by the borrower, as required by NMI's underwriting guidelines, the unreasonableness of the borrower's stated income would have been evident.

- A loan that closed on November 13, 2006 with a principal balance of $273,000 was originated as a stated income loan.  The loan application stated that the borrower was an Auto Body Technician earning $7,366 per month, which exceeded by more than 1.5 times the 2006 Bureau of Labor Statistics 90th percentile salary for Automotive Service Technicians and Mechanics in the same geographic region of $4,544.  There is no indication that the loan underwriter assessed the reasonableness of the borrower's stated income.  Had such an assessment been performed, it would have been a red flag that the borrower's income was overstated.  Further, the borrower provided bank statements that reflected payroll deposits of an average of $1,565.27 every two weeks.  Using the net income of $3,391.42 based on these deposits and applying a 30% tax rate results in gross income of $4,472.20, which is consistent with the BLS data at that time.  A recalculation of DTI based on all evidence uncovered in the forensic review yields a DTI of 124.88 percent, which far exceeds the guideline maximum allowable DTI of 50 percent.

- A loan that closed on October 3, 2006 with a principal balance of $266,400 was originated as a stated income loan.  The loan application stated that the borrower was a nurse earning $5,250 per month.  The September 27, 2006 verbal verification of employment ("VVOE") in the loan file, however, states that the borrower's job title was not "nurse," but "Patient Care Tech."  The borrower's stated income was more than twice the 2006 Bureau of Labor Statistics 90th percentile salary for Nursing Aides, Orderlies and Attendants in the same geographic region of $2,247.  There is no indication that the loan underwriter assessed the reasonableness of the borrower's stated income.  Had such an assessment been performed, it would have been a red flag that the borrower's income was overstated.  A recalculation of DTI based on all evidence uncovered in the forensic review yields a DTI of 147 percent, which exceeds the guideline maximum allowable DTI of 50 percent.

- A loan that closed on October 31, 2006 with a principal balance of $121,500 was originated as a stated income loan.  The loan application stated that the borrower was a Housekeeper earning $3,000 per month.  The origination loan file, however, contained an initial loan application, signed and dated by the Loan Officer on October 16, 2006, reflecting the borrower's stated income as $2,500 per month; an undated Uniform Underwriting and Transmittal Summary reflecting the borrower's stated income as $2,250 per month; and a Final Loan Detail, dated October 30, 2006, reflecting the borrower's stated income as $2,800 per month.  The varying income figures should have been a red flag to the loan underwriter that the borrower's income was overstated.  Further, the borrower's post-closing 2007 tax returns reflected earnings of $545 per month.  A recalculation of DTI based on all evidence uncovered

-37-

in the forensic review yields a DTI of 264.01 percent, which exceeds the guideline maximum allowable DTI of 60 percent.

- A loan that closed on October 10, 2006 with a principal balance of $405,000 was originated as a stated income loan. The loan application stated that the borrower was in Construction, earning $5,000 per month. The origination loan file, however, contained a VVOE that verified that the borrower's more specific job title at origination was General Laborer. Further, the borrower's initial application stated that the borrower's income was $6,800 per month. The varying income figures should have been a red flag to the loan underwriter that the borrower's income was overstated. The borrower's stated income exceeded the 2006 Bureau of Labor Statistics 90th percentile salary for Construction Laborer in the same geographic of $3,936. There is no indication that the loan underwriter assessed the reasonableness of the borrower's stated income. Had such an assessment been performed, it would have been a red flag to the loan underwriter that the borrower's income was overstated. A recalculation of DTI based on all evidence uncovered in the forensic review yields a DTI of 111.72 percent, which exceeds the guideline maximum allowable DTI of 48 percent.

103.    As these examples reflect, a significant number of mortgage loans were made on the basis of "stated incomes" that were facially unreasonable and not verified, such that the loans were not properly originated. The forensic review demonstrates that the representations in the Registration Statements concerning the originators' verification of the reasonableness of the stated income were materially false and misleading.

## 2.    Debts Were Incorrectly Calculated and DTIs Exceeded Guidelines

104.    Failure to incorporate all of a borrower's monthly obligations precludes the lender from properly evaluating the borrower's ability to repay the loan. The Prospectus Supplements state that, "[p]rior to issuing an approval on the loan, the loan underwriter runs an independent credit report, which provides detailed information concerning the payment history of the borrower on all of their debts to verify that the information submitted by the broker is still accurate and up to date." (NHEL 2006-3 Pro. Supp. at S-78; NHEL 2006-6 Pro. Supp. at S-71 (providing that the loan underwriter may also "pull[] a reissue of the client['s] credit through an

independent 3rd party vendor").)  The borrower's monthly debt obligations are paramount in determining whether the borrower has the ability to repay a loan according to its terms.

105.    The following are some examples where the underwriting process either failed to incorporate all of the borrower's debt or the monthly debt obligations were incorrectly calculated.  When properly calculated, the borrower's actual DTI exceeded the limits established by the applicable underwriting guidelines.  The failure to calculate debt properly led to material misstatements regarding the credit risk of the securitized loans.

- A loan that closed on October 17, 2006 with a principal balance of $277,950 was originated as a stated income loan.  The loan underwriter calculated the borrower's monthly debt as $5,730, but the forensic review of the loan file reveals that the correct monthly debt should have been calculated as $7,238.  The loan underwriter failed to include the correct tax payment, hazard insurance payment, and homeowners' association payment, as well as the correct figure for debts extraneous to the subject mortgage.  The re-underwriter was unable to recalculate the DTI because the borrower's income documentation indicated a negative income.

- A loan that closed on November 14, 2006 with a principal balance of $96,000 was originated as a stated income loan.  The loan underwriter calculated the borrower's monthly debt as $1,230, but the forensic review of the loan file reveals that the correct monthly debt should have been calculated as $3,472.  The loan underwriter failed to include a monthly payment of $2,242 for the borrower's private residence.  A recalculation of DTI based on all evidence uncovered in the forensic review, including the borrower's verified income, yields a DTI of 958.84 percent, which exceeds the guideline maximum allowable DTI of 50 percent.

- A loan that closed on September 29, 2006 with a principal balance of $56,000 was originated as a full documentation loan.  The loan underwriter calculated the borrower's monthly debt as $3,267, but the forensic review of the loan file reveals that the correct monthly debt should have been calculated as $4,922.  The loan application revealed that the loan underwriter failed to account for an additional property owned by the borrower, as well as the correct monthly tax and hazard insurance payments.  A recalculation of DTI based on all evidence uncovered in the forensic review yields a DTI of 59.64 percent, which exceeds the guideline maximum allowable DTI of 50 percent.

- A loan that closed on October 6, 2006 with a principal balance of $99,000 was originated as a full documentation loan.  The loan underwriter calculated the borrower's monthly debt as $929, but the forensic review of the loan file reveals that the correct monthly debt should have been calculated as $1,334.  The loan underwriter failed to include any consumer debt.  A recalculation of DTI based on all

evidence uncovered in the forensic review yields a DTI of 68.19 percent, which exceeds the guideline maximum allowable DTI of 55 percent.

### 3.      Credit Inquiries Indicated Misrepresentations of Debts

106.     The forensic review also found examples where the borrowers' credit reports contained numerous credit inquiries that should have put the loan underwriters on notice for potential misrepresentations of debt obligations to be included in the borrowers' DTI.  Had the loan originators properly addressed these irregularities, the undisclosed liabilities could have been discovered.  Failure to investigate these issues prevented the loan underwriting process from appropriately qualifying the loan and evaluating the borrower's ability to make timely payments on the mortgage loan.

- A loan that closed on September 29, 2006 with a principal balance of $67,500 was originated as a stated income loan.  A credit report included in the origination file dated three days prior to closing shows eight credit inquiries within the previous 90 days.  There was no evidence in the origination file that the loan underwriter researched these credit inquiries or took any action to verify that such inquiries were not indicative of undisclosed liabilities of the borrower.  Moreover, the borrower purchased five properties within 30 days of closing of the subject loan, including three properties on the same street as the subject property.  These undisclosed mortgage loans combined for a monthly payment total of $2,895.  A recalculation of the DTI based on all evidence uncovered in the forensic review, including the borrower's verified income of $2,292, yields a DTI of 358.73 percent, which exceeds the guideline maximum of 55 percent.

- A loan that closed on November 10, 2006 with a principal balance of $332,500 was originated as a full documentation loan.  A credit report included in the origination file dated 28 days prior to closing shows 15 credit inquiries within the previous 90 days.  There was no evidence in the origination file that the loan underwriter researched these credit inquiries or took any action to verify that such inquiries were not indicative of undisclosed liabilities of the borrower.  Moreover, the borrower purchased a property within 30 days of closing of the subject loan, with a monthly mortgage payment of $1,665.  A recalculation of the DTI based on all evidence uncovered in the forensic review, including the borrower's properly calculated monthly income of $2,374.98, yields a DTI of 154.01 percent, which exceeds the guideline maximum of 50 percent.

   **b. Originators of the Loans in the NovaStar Trusts
    Systematically Disregarded NMI's Underwriting
    Guidelines Throughout the Relevant Period**

107. In September 2011, FHFA, in its capacity as conservator of Freddie Mac and

Fannie Mae, commenced securities lawsuits against various financial institutions and certain of

their officers arising from Freddie Mac's and Fannie Mae's purchases of PLS.  The Honorable

Denise L. Cote, U.S.D.J., of the United States District Court for the Southern District of New

York presided over 16 of FHFA's securities action, including the only one to proceed to trial:

*Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*, 104 F. Supp.

3d 441 (S.D.N.Y. 2015), *aff'd*, 873 F.3d 85 (2d Cir. 2017) ("*FHFA v. Nomura*").  In *FHFA v.

Nomura*, FHFA secured a judgment following a bench trial before Judge Cote, which judgment

was thereafter affirmed by a panel of the United States Court of Appeals for the Second Circuit.

108. As Judge Cote explained in her post-trial opinion, shoddy mortgage loan

origination practices were not only rampant in the run-up to the financial crisis, but one of the

principal causes of the crisis:

> Shoddy origination practices that are at the heart of this lawsuit were part and
> parcel of the story of the housing bubble and economic collapse that followed
> when that bubble burst.
>
> ….
>
>   Shoddy underwriting practices (as opposed to relaxed underwriting
> standards) … contributed to both the spectacular expansion of the subprime
> mortgage and securitization markets and their contraction.  The ability of
> originators to quickly sell and shift the risk of subprime loans off their books
> reduced their incentive to carefully screen borrowers.  They approved loans that
> did not comply with stated underwriting guidelines and they misrepresented the
> quality of those loans to purchasers.  Appraised values were overstated, owner
> occupancy was misreported, credit risk was hidden, and second liens were
> undisclosed.  In short, these shoddy practices contributed to the housing price
> boom.

104 F. Supp. 3d at 537, 539.

109.    In affirming the *FHFA v. Nomura* judgment, the Second Circuit agreed, holding that "[t]he RMBS industry in the lead up to the financial crisis was a textbook example of a small set of market participants racing to the bottom to set the lowest possible standards for themselves."  873 F.3d at 134.

110.    The Third Amended Complaint in the Class Action (the "Class Action Complaint") makes clear that these industry-wide shoddy underwriting practices infected the NovaStar Bonds here.  Based in part upon interviews with six high ranking former NMI and/or NFMC representatives, including individuals intimately involved with the reunderwriting process, the Class Action Complaint alleged, among other deficient practices, the following:

- "According to former [Loan] Underwriters, Account Managers and Supervisors at NovaStar, this pressure to achieve loan production resulted in a systematic loosening of NovaStar's adherence to its underwriting guidelines."  (Class Action Complaint, at ¶ 84.)

- "[Financial] incentives helped cause the approval of loans that did not comply with [NMI] guidelines."  (*Id.* at ¶ 84.)

- "QC Auditors began routinely alerting their Supervisors about loans rejected due to suspicious or fraudulent documentation, only to learn that the rejection of the suspicious or fraudulent loan by the [Loan] Underwriter and QC Auditor had been overridden by Supervisors and VPOs and the loan had been approved."  (*Id.* at ¶ 85.)

- "[A] former NovaStar QC Auditor reported that NovaStar would routinely override rejections of denials of loans to self-employed borrowers who presented highly questionable employment documentation."  (*Id.* at ¶ 89.)

- "A former Senior [Loan] Underwriter confirmed that this practice of overriding rejections resulted in many loan applications improperly being classified as Full Document loans."  (*Id.* at ¶ 90.)

- NMI frequently failed to comply with its guideline's requirements that Full Document loans require employment verifications.  (*Id.* at ¶ 91.)

- NMI more often than not failed to meet deadlines to complete employment and credit score verifications, which in turn caused further underwriting guideline violations.  (*Id.* at ¶¶ 92-93.)

### 2.     The Registration Statements' Statistical Data Concerning
###          LTV Ratios Were Materially False or Misleading

111.    Freddie Mac's analysis of the representative samples of loans from the NovaStar

Trusts has also revealed that the LTV ratios disclosed in the Registration Statements were

materially false and understated when the loans were originated and securitized.

112.    For each of the sampled loans, an industry-standard automated valuation model

("AVM") was used to calculate the value of the underlying property when the mortgage loan was

originated.  AVMs are routinely used in the industry as a way of valuing properties during

prequalification, origination, portfolio review, and servicing.  AVMs rely upon data similar to

that upon which appraisers rely:  primarily county assessor records, tax rolls, and data on

comparable properties.  AVMs produce independent, statistically-derived valuation estimates by

applying modeling techniques to this data.

113.    Here, an AVM analyzed the value of properties securing the loans within the

samples and determined that the original appraised values given to such properties were

significantly higher than the values as determined by the AVM.  The overstatement of property

values results in a material understatement of LTV ratios.  That is, if a mortgaged property's true

value is significantly less than the value used in the original loan underwriting, then the loan

represents a significantly higher percentage of the property's value.  This increases the risk that a

borrower will not repay the loan and the risk of greater losses in the event of a default.  Indeed,

the Prospectus Supplements themselves state that "[m]ortgage loans with a loan-to-value ratio in

excess of 80% will be affected to a greater extent than mortgage loans with a loan-to-value ratio

equal to or less than 80% by any decline in the value of the related property securing such

mortgage loans."  (NHEL 2006-3 Pro. Supp. at S-12; NHEL 2006-6 Pro. Supp. at S-12.)

114.     The representative loan samples revealed that, for each NovaStar Trust, the Prospectus Supplement misrepresented the percentage of loans with an LTV ratio above 100 percent, as well as the percentage of loans that had an LTV ratio at or below 80 percent at the time of their origination.  For example, for the NHEL 2006-3 Certificates that Wells underwrote, the Prospectus Supplement stated that no LTV ratios for the Supporting Loan Group were above 100 percent.  (NHEL 2006-3 Pro. Supp. at S-3, S-48.)  In fact, however, 18.8 percent of the sample of loans included in the data review had LTV ratios above 100 percent.  In addition, the Prospectus Supplement stated that 53.38 percent of the loans in the Supporting Loan Group had LTV ratios at or below 80 percent.  (NHEL 2006-3 Pro. Supp. at S-42.)  The samples, however, indicated that only 30.4 percent of the loans had LTV ratios at or below 80 percent.

115.     Similar LTV misrepresentations were made regarding the NHEL 2006-6 Certificates that Wells underwrote.  For example, the Prospectus Supplement for the NHEL 2006-6 Certificates stated that no LTV ratios for the Supporting Loan Group were above 100 percent.  (NHEL 2006-6 Pro. Supp. at S-3, S-45.)  In fact, however, 37.1 percent of the sample of loans included in the representative samples had LTV ratios above 100 percent.  In addition, the Prospectus Supplement stated that 50.06 percent of the loans in the Supporting Loan Group had LTV ratios at or below 80 percent.  (NHEL 2006-6 Pro. Supp. at S-39.)  The data review, however, indicated that only 18.6 percent of the loans had LTV ratios at or below 80 percent.

116.     Independent appraisers following proper practices, and providing genuine estimates as to valuation, would not systematically generate appraisals that deviate so significantly (and so consistently upward) from the true values of the appraised properties.  These consistent errors demonstrate that, contrary to the representations in the Registration Statements, the appraisers did not comply with the Uniform Standards of Professional Appraisal

Practice, but instead generated appraisal values to justify the issuance of a mortgage loan. This conclusion is further confirmed by the findings of the Financial Crisis Inquiry Commission ("FCIC"), which identified "inflated appraisals" as a pervasive problem during the period when the NHEL Certificates were issued, and determined through its investigation that appraisers were often pressured by mortgage originators, among others, to produce inflated results. (*See* FCIC, Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States (2011), at 91-92.)

> **3. The Collapse of the NovaStar Bonds' Credit Ratings Shows that the Rating Agencies Were Provided False Information About the Underlying Loans**

117. The total collapse of the NovaStar Bonds' credit ratings, from AAA to non-investment grade, proves that the NovaStar Bonds were impaired from the start and that their original ratings were based upon false loan-level information, including that alleged in Section C.1 and C.2 *supra*, provided to the rating agencies.

118. When the NovaStar Bonds were issued, the credit rating agencies assigned them ratings of AAA or its equivalent. Upon information and belief, those ratings were based upon what the rating agencies understood to be adequate subordination, based upon the description of the mortgage loan collateral and underwriting practices set forth in the Registration Statements and provided to the rating agencies. In fact, however, because characteristics of the mortgage loan collateral were misrepresented to the credit rating agencies, and because NMI's underwriting guidelines were not followed, the NovaStar Bonds had insufficient subordination, such that Freddie Mac suffered losses inconsistent with a AAA rating.

119. Upon information and belief, NMI, its affiliates and/or the Underwriters provided the rating agencies with false loan-level information, including false LTV ratios, regarding the loans in the NovaStar Trusts. Upon further information and belief, Wells and the other

Underwriters worked with NMI and its affiliates to select the pool of mortgage loans underlying the NHEL Certificates and otherwise to structure the NovaStar Trusts in a manner that would secure AAA ratings for tranches of a particular size, including for the NovaStar Bonds.  Upon further information and belief, the rating agencies relied upon the false information provided to them to determine the subordination necessary for the AAA tranches of the NovaStar Trusts, including the NovaStar Bonds.  Specifically, because the information provided to the rating agencies was materially false, the models used by the rating agencies under-predicted the likelihood of delinquency and loss, as well as the loss severity.  As a result of the false information provided, the NovaStar Trusts lacked the level of subordination required for the NovaStar Bonds properly to be rated AAA (or its equivalent), and investors, including Freddie Mac, were deprived of the level of protection commensurate with a AAA (or equivalent) rating. Accordingly, the NovaStar Bonds were offered to investors and purchased at prices suitable for AAA investment grade securities, when in fact the NovaStar Bonds actually carried a severe risk of loss and inadequate credit enhancement, and thus should not have been rated AAA (or its equivalent).  Upon information and belief, Wells was aware that false information about the loans in the NovaStar Bonds had been provided to the rating agencies, but made no effort to correct it.

120.    Beginning in mid- to late 2008, the credit rating agencies began to downgrade the NovaStar Bonds to reflect the real risk of the Bonds that was being revealed.  Table 2 details the extent of the continuous downgrades:

**Table 2:  Ratings Downgrades of NovaStar Bonds**[10]

| Transaction | Tranche | Rating at Issuance (Moody's/S&P) | Ratings as of October 2008 | Rating as of May 2019 |
|---|---|---|---|---|
| NHEL 2006-3 | A1A | Aaa/AAA | Aa3/A | Caa2/CCC |
| NHEL 2006-6 | A1A | Aaa/AAA | Ba2/AAA | Ca/CC |

121.    Upon information and belief, the credit rating agencies downgraded their ratings for the NovaStar Bonds because the defaults, foreclosures and/or delinquencies among mortgage loans within the NovaStar Trusts proved to be less creditworthy than originally represented, resulting in massive losses to the NHEL Certificates.  The overall poor performance of those mortgage loans is a direct consequence of the fact that they had not been underwritten pursuant to NMI's underwriting guidelines, as represented in the Registration Statements.

122.    Table 3 reflects the percentage of loans in the Supporting Loan Groups that had defaulted, been foreclosed upon, or become delinquent as of September 2008, when FHFA placed Freddie Mac into conservatorship, and August 2011, when FHFA and Freddie Mac first entered into the Tolling Agreement with Wells.

**Table 3:  Delinquent or Defaulted Loans within NovaStar Trusts**

| Transaction | September 2008 | August 2011 |
|---|---|---|
| NHEL 2006-3 | 37.17% | 47.21% |
| NHEL 2006-6 | 38.27% | 44.20% |

123.    Loan groups that had been underwritten properly and contained loans with the characteristics represented in the Registration Statements would have experienced substantially fewer payment problems and substantially lower percentages of defaults, foreclosures, and delinquencies than occurred here.

---

[10]     Because Fitch Ratings did not rate the NHEL 2006-6 Certificates at issuance, and FHFA has been unable to access Fitch's October 2008 rating for NHEL 2006-3, FHFA has limited this chart to Moody's and S&P ratings only.

124.   The forensic review proving an abandonment of NMI's underwriting guidelines, the confirmed misstatements concerning the LTV ratios, and the extraordinary drop in credit ratings caused by the rise in delinquencies and defaults across the NovaStar Trusts all indicate that the mortgage loans in the Supporting Loan Groups, contrary to the representations in the Registration Statements, were not originated in accordance with NMI's underwriting guidelines.

**D.     Wells's Failure to Conduct Proper Due Diligence on the Registration Statements**

125.   During pretrial proceedings in *FHFA v. Nomura*, Judge Cote granted FHFA's motion for partial summary judgment dismissing as a matter of law the statutory "due diligence" affirmative defense asserted by the non-issuer underwriter defendants pursuant to 15 U.S.C. § 77k(b)(3)(A).   In doing so, Judge Cote explained the importance of underwriter due diligence:

> The underwriter … undertakes to investigate the issuer in order to make certain representations to the public purchasing its issue.   "No greater reliance in our self-regulatory system is placed on any single participant in the issuance of securities than upon the underwriter."   *Chris-Craft Indus., Inc. v. Piper Aircraft Corp.*, 480 F.2d 341, 370 (2d Cir. 1973).   "Congress recognized that underwriters occupied a unique position that enabled them to discover and compel disclosure of essential facts about the offering" and accordingly placed them under the *in terrorem* threat of Section 11 liability, believing this "would provide the necessary incentive to ensure their careful investigation of the offering."   SEC Rel. 7606A, 1998 WL 792508, at *75.   Accordingly, the underwriter's diligence burden is heavy.   **To avail itself of the due diligence defense, an underwriter "must conduct an investigation reasonably calculated to reveal all those facts that would be of interest to a reasonably prudent investor."** *Id.* at 92 (citation omitted).

68 F. Supp. 3d 439, 470-71 (S.D.N.Y. 2014) (emphasis added).

126.   Regarding underwriters unaffiliated with the issuer – like Wells here – Judge Cote explained the particularly "heavy burden" they bear in the context of RMBS:

> … The adversity and thoroughness of the unaffiliated underwriter may be even more vital in the case of RMBS than it is in the context of equity securities. The accuracy of core representations in the offering of equity securities may be able to be checked by outside accountants, outside directors, market analysts, and sophisticated investors.   With RMBS, the value of the certificates depends upon the reliability of the data listed on the loan tapes, and the sole source against

which to check the tapes – the loan files – are not available to the public.  Indeed, here, the only post-acquisition review of that accuracy was undertaken by the unaffiliated underwriter.

The record reflects that RMBS sponsors … entered into contracts with residential mortgage loan originators, frequently agreeing to limit their pre-purchase diligence on the originators' loans.  The originator stands to gain from inflating the quality of the loans it sells to a sponsor.  And the evidence before the Court on this motion paints the private-label RMBS securitization market in 2005-2007 as one in which sponsors were fiercely competing to securitize an ever greater share of residential mortgage loans.  In such an environment, sponsors have reason to accede to originators' demands and look the other way, conducting half-hearted review and rejecting only an acceptably small percentage of offered loans.  In these circumstances, if an unaffiliated underwriter did not thoroughly review the quality of the Supporting Loan Groups and confirm that the Offering Documents' descriptions were accurate, there was a substantial risk that no one would.

"By associating himself with a proposed offering [an underwriter] impliedly represents that he has made [a reasonable] investigation in accordance with professional standards.  Investors properly rely on this added protection …." 41 SEC 398 [1961-1964 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 76,904, 1963 WL 63647 (Feb. 27, 1963).  **In the circumstances set out above, should an unaffiliated underwriter lend its name to an RMBS offering, it must conduct a searching review of the underlying loans if it seeks the protection of Section 11's due diligence defense.**  This is not to suggest, however, that such review must individually examine each loan file, or that a reasonably diligent review cannot be accomplished through the application of appropriate sampling methods.

68 F. Supp. 3d at 471-72 (emphasis added).

127.    Applying these standards, Judge Cote found that all underwriters in *FHFA v. Nomura* – both those affiliated with the issuer and those that were unaffiliated – were precluded as a matter of law from asserting a "due diligence" defense.  68 F. Supp. 3d at 486.  Thus, for example, Judge Cote found legally insufficient the following practices of RBS, an unaffiliated underwriter both there and here:

RBS signed off on the representations concerning the loans in 2006-HE3, having seen only a one-page summary of Nomura's pre-acquisition review of all the Trade Pools that contributed loans to that Securitization and a list of those Originators who contributed more than 5% of the loans to the Securitization.  The one-page summary included a disclaimer advising that "[t]he material contained herein is preliminary and based on sources which we believe to be reliable, but it

is not complete, and we do not represent that it is accurate." RBS has identified no evidence that it followed up on this disclaimer and demanded a representation from Nomura that this summary of Nomura's review was complete and accurate.

RBS was the sole lead underwriter for 2006-FM2, yet it performed no review of the underlying loans. Instead, it relied entirely on Nomura's (which acted as issuer) pre-acquisition review of the Trade Pools. …

There is no evidence that RBS ever asked in connection with either Securitization how loans in the Trade Pools were mapped to [supporting loan groups]. …

Moreover, in both [securitizations], RBS failed utterly to "play devil's advocate." *Feit*, 332 F. Supp. at 582 (citation omitted). It performed no "independent verification of the [sponsor]'s representations." *Id*. (citation omitted). Instead of testing those representations, it accepted them.

68 F. Supp. 3d at 482.[11]

128.  As Wells did here with respect to the NHEL Certificates and NovaStar Bonds,

RBS in *FHFA v. Nomura* held itself out as a "co-lead" underwriter on certain securitizations.

---

[11]  In Judge Cote's post-trial opinion, she described RBS's due diligence as follows:

The RBS diligence review for these two Securitizations resembled the Nomura pre-acquisition due diligence program in certain critical respects. Like Nomura, RBS had no written due diligence guidelines and provided no formal training program for its due diligence employees. It typically conducted due diligence on a sample of the loans, but had no reliable basis for extrapolating the results of the due diligence review to the entire population from which the sample was drawn, and never made any attempt to do so. Nor did RBS integrate its due diligence with the disclosures in the Prospectus Supplements. Its due diligence team had no role in reviewing the accuracy of representations in Prospectus Supplements and did not understand that its work was in any way connected to the representations that would be made in Prospectus Supplements. … [T]here was no one at RBS who acted to ensure that the representations in the Prospectus Supplements that are at issue in this case were truthful.

…

The due diligence program run … by RBS [was] entirely inadequate to protect against false statements in the Offering Documents. But even with their many serious limitations, those programs provide striking confirmation of the deeply flawed nature of the originators' underwriting programs and the falsity of defendants' descriptions of the origination process. The serious limitations in defendants' due diligence programs were legion.

104 F. Supp. 3d at 483, 560.

Notwithstanding that fact, RBS asserted that "it actually served only as a participating underwriter, delegating its responsibilities to its co-lead underwriter, Nomura Securities."  68 F. Supp. 3d at 483.  Even assuming that RBS had only been a "participating" as opposed to a "lead" underwriter, Judge Cote held that,

> [w]here an underwriter does not undertake its own review of the underlying loans, it must assure itself that the other entity's review upon which it purports to rely was thorough, unbiased, and reliable, and that it continues to provide a sufficient basis to believe the Offering Documents will be accurate as of the effective date of the SEC filing.  **An underwriter abandons the posture of a skeptic at its own peril.**

*Id.* (emphasis added).[12]  Judge Cote then held that RBS's due diligence was legally insufficient even under the "participating underwriter" standard:

> [RBS's] purported agent's diligence was inadequate for the reasons above, and RBS has identified insufficient evidence for a jury to conclude that RBS had a reasonable basis to believe that Nomura Securities's "program of investigation and actual investigative performance [we]re adequate."  SEC Rel. 9671, 1972 WL 125474, at *6.  As of the time of this Securitization in August 2006, RBS had received very little information about Nomura's review processes.  **Whether RBS is considered a co-lead underwriter or a participating underwriter, no reasonable jury could find that a prudent man in the management of his own property would do so little to assure himself that the loans were accurately described in the Offering Documents.**

---

[12]     Elsewhere, Judge Cote noted that, while a "participating" underwriter need not duplicate the investigation by the lead underwriter,

> "the delegation to the manager and the subsequent reliance on his investigation must be 'reasonable in light of all the circumstances'" **and the participant "must satisfy himself that the managing underwriter makes the kind of investigation the participant would have performed if he were the manager**."  *Id.*; *accord* Circumstances Affecting the Determination of What Constitutes Reasonable Investigation and Reasonable Grounds for Belief Under Section 11 of the Securities Act, SEC Release No. 6335, available at 1981 WL 31062, at *15 n.66 (quoting SEC Rel. 9671).  **The participant "should assure himself that the manager's program of investigation and actual investigative performance are adequate."**  SEC Rel. 9671, 1972 WL 125474, at *6.

68 F. Supp. 3d at 472-73 (emphasis added).

*Id.* (emphasis added) (footnote omitted).

129.    FHFA is informed and believes that the due diligence practices deemed legally insufficient in *FHFA v. Nomura* infected the entire RMBS market.  Based upon that information and belief, FHFA alleges that Wells's due diligence practices here were at least as deficient as those deemed legally insufficient in *FHFA v. Nomura*, and constituted a substantial reason why the Registration Statements for the NovaStar Bonds materially misstated or omitted material facts.

**E.    Freddie Mac Was Damaged by Wells's Section 11 Violations**

130.    The statements and information in the Registration Statements regarding the credit quality and characteristics of the mortgage loans underlying the NovaStar Bonds, and the origination and underwriting practices pursuant to which those mortgage loans purportedly were originated, were material to a reasonable investor.  Wells is legally responsible for the contents of those Registration Statements.  But for the misrepresentations and omissions in the Registration Statements concerning those matters, Freddie Mac would not have purchased the NovaStar Bonds.

131.    Freddie Mae incurred substantial losses on the NovaStar Bonds due to a decline in value that is directly attributable to material misrepresentations and omissions for which Wells is legally responsible.  Among other things, the mortgage loans underlying the NovaStar Bonds experienced defaults and delinquencies at a higher rate than would have been the case had the loans underlying the NovaStar Bonds actually conformed to the origination guidelines, and had the NovaStar Bonds merited the credit ratings set forth in the Registration Statements.

132.    The misstatements and omissions in the Registration Statements were the direct, proximate and actual cause of Freddie Mac's losses resulting from their purchase of the NovaStar Bonds.  Among other things, it was foreseeable to Wells that non-compliant loans

would suffer higher incidences of delinquency and default than loans underwritten in accordance with originators' underwriting standards.  It was also foreseeable to Wells that the NovaStar Bonds were overvalued at issuance, because the AAA rating the Bonds received was unwarranted and based upon false information provided to the rating agencies.  Although clearly significant, the precise extent of Freddie Mac's injuries will be proven at trial.

133.    FHFA was appointed Conservator of Freddie Mac on September 6, 2008.  Despite the exercise of reasonable diligence, Freddie Mac could not reasonably have discovered the untrue statements and omissions in the Registration Statements more than one year prior to FHFA's appointment as Conservator.

## CAUSE OF ACTION

### Violation of Section 11 of the Securities Act of 1933

134.    FHFA re-alleges paragraphs 1 through 133 above as if fully set forth herein.

135.    On behalf of its conservatee Freddie Mac, FHFA asserts a claim for damages under Section 11(a)(5) of the Securities Act of 1933, arising from Freddie Mac's purchases of the NovaStar Bonds, which were issued pursuant to the Registration Statements for the NHEL Certificates.

136.    When the Registration Statements for the NHEL Certificates became effective, each of the Registration Statements contained material misstatements of fact and omitted information necessary to make the facts stated therein not misleading.  The material misstatements of facts and omissions of material fact include, without limitation, those set forth in Sections B and C *supra*, namely falsely representing that loans in the NovaStar Trusts complied with NMI's underwriting guidelines, representing false LTV ratios for the mortgage loans in the Supporting Loan Groups, and falsely representing the riskiness of the NovaStar

Bonds with unwarranted credit ratings procured by providing false information to the credit rating agencies.  The NovaStar Bonds were overvalued at issuance for these and other reasons.

137.    The facts misstated or omitted in the Registration Statements were material to a reasonable investor in the NovaStar Bonds, because, if represented accurately in the Registration Statements, those facts would have significantly altered the total mix of information available regarding the NovaStar Bonds, and a reasonable investor would have considered those facts significant in making investment decisions about the NovaStar Bonds.

138.    Wells acted as an underwriter, a joint lead manager, and a joint book-runner for the NovaStar Trusts and the NHEL Certificates, including the NovaStar Bonds.  In its capacity as joint lead manager and underwriter for the NovaStar Trusts and the NHEL Certificates, Wells participated in the selection of the mortgage loans underlying the NHEL Certificates, the structuring of transactions, and the dissemination of the false and misleading Registration Statements.  Wells was directly or indirectly involved in the distribution, offer, and sale of the NHEL Certificates and NovaStar Bonds to investors.  As an underwriter for the NHEL Certificates and NovaStar Bonds, Wells is strictly liable for the misstatements and omissions in the Registration Statements under Section 11(a)(5) of the Securities Act of 1933.

139.    Having assumed the role of an underwriter for the NHEL Certificates and NovaStar Bonds, Wells was obligated to conduct due diligence on and make a reasonable investigation of the statements contained in the Registration Statements when the Registration Statements became effective to ensure that such statements were true and correct and that there were no omissions of material facts required to be stated in order to make the statements contained therein not misleading.

140.     Wells did not exercise sufficient, if any, due diligence and failed to conduct a reasonable investigation of the truthfulness or accuracy of the statements contained in the Registration Statements when the Registration Statements became effective, as alleged in Sections C and D *supra.*

141.     Freddie Mac purchased the NovaStar Bonds pursuant to the false and misleading Registration Statements.  When it purchased the NovaStar Bonds, Freddie Mac was unaware of the false and misleading statements and omissions alleged herein, and if it had known those facts, it would not have purchased the NovaStar Bonds.

142.     By virtue of the foregoing, Freddie Mac sustained substantial damages, including depreciation in the value of the NovaStar Bonds, as a result of the misstatements and omissions in the Registration Statements, and FHFA is entitled to damages from Wells.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff FHFA prays for an award in its favor against Wells for:

a.     All damages available under Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k;

c.     Attorneys' fees and costs;

d.     Prejudgment interest at the maximum legal rate; and

e.      Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a trial by jury on all issues triable by jury.

DATED:      New York, New York
            June 3, 2019

MCKOOL SMITH, LLP

By:    _____
            Christopher P. Johnson
            (cpjohnson@mckoolsmith.com)
        Kyle A. Lonergan
        (klonergan@mckoolsmith.com)
        H. Lawrence Stierhoff
        (lstierhoff@mckoolsmith.com)
        Drew B. Hollander
        (dhollander@mckoolsmith.com)
        One Bryant Park
        47th Floor
        New York, New York  10036
        (212) 402-9400

        *Attorneys for Plaintiff Federal Housing
        Finance Agency, in its Capacity as
        Conservator of the Federal Home Loan
        Mortgage Corporation*